Morning, Your Honors. May it please the Court. We're asking in this case that the Court reverse and remand the District Court's denial in part of a suppression motion filed by Alex Salgado, in particular the denial of suppression of physical evidence that was obtained following a drug dog search of Mr. Salgado's vehicle. We're also asking that the District Court reverse and remand the District Court's denial to the defendant of an opportunity to review drug dog field records from the dog that was used for the search and its reliance on those records in its decision to deny the suppression motion. There are really two points at which the trooper involved in the search we feel violated the Fourth Amendment. The first is his escalation of an initial consensual encounter with a vehicle on the side of the road to a custodial setting, and the second being the unreasonable extension of the time of that stop to facilitate getting a drug dog on scene and allowing the dog to search. If I can take those in that order, the trooper in this instance came upon a vehicle beside the side of the road about two miles out of the town of Winter, South Dakota. When he came up and came around and activated his amber lights and started up to the vehicle, he was approached by two of the three men by the vehicle who said, we're okay, we don't need help. The trooper came up with a flashlight, looked in the back of the vehicle, and saw another individual sitting in the backseat of the vehicle, and also saw, as he described it, a hoodie sweatshirt that was laying over some electronics equipment. Is that the one with the marijuana leaf on it? The hoodie had a marijuana leaf on it. Based on that, the trooper concluded that he had a reasonable articulable suspicion. Those were the two criteria that he relied on in his testimony at the suppression hearing, that the folks said they didn't want help or didn't need help, and that there was electronics in a hoodie. Based on that, the trooper escalated that consensual encounter to a custodial encounter, and he did so by demanding Mr. Salgado's driver's license and asking further questions. I think it's important in this instance to recognize that the demand for a driver's license is qualitatively different in the setting of this is not a vehicle stop. This is not an instance where the trooper had followed the vehicle and saw it committing some violation of the law. It is simply a vehicle on the side of the road by the trooper's own admission, violating no law. It was appropriately off to the side of the road. They had their flashers on. There was not a problem with the vehicle. But once those individuals said we don't need any help, the trooper essentially relied on the refusal of help, the refusal to have contact with law enforcement, as a reasonable articulable suspicion, a basis of that reasonable articulable suspicion, to elevate it to a custodial inquiry with them. So your position is that it became non-consensual when the trooper asked for the driver's license? Because it looks like the district court said as soon as he said he had no driver's license, but you have it one step earlier. That's exactly right, Judge Kelley. The district court concluded that about six minutes into the stop, Mr. Salgado had identified that he didn't have a driver's license. At that point, the district court concluded it was a non-consensual encounter. There was no Miranda and excluded all the statements made by Mr. Salgado and the co-defendants from that point forward. We think it's just one click earlier, particularly in light of the fact that this is not based on any violation of the law. The initial encounter is truly just a consensual encounter, and there's no basis for those individuals to be questioned further at that point. As you look at the timeline of events, I think once that issue's addressed, that this was elevated to a non-consensual encounter at that point, the drug interdiction and the questions that the trooper did that extended that stop and the citation of Mr. Salgado for no driver's license and the extension of time for the drug dog start to somewhat intermingle, because what the trooper's doing really, it just kind of blends into one. If you look at the timeline at 140- Why don't you go back and elaborate a little bit on why you think it's a seizure to ask Salgado if he has a driver's license? Because I think at that point, Judge Colleton, a reasonable person in Mr. Salgado's position, would not view themselves as free to reject help or leave the situation. And it's complicated in somewhat, because the vehicle at that point was not running, it was overheated. But the trooper came and asked for ID and had initially been told we don't need any help, we don't need anything. It becomes a seizure because at that point, the trooper exercises control and dominion over the situation. I think a reasonable person in that setting would not view themselves as able to refuse further interaction with the trooper. Not able to refuse to interact and answer those questions. And so we rely on Florida versus Bostic, because in this instance, essentially what the trooper did to move the next step on was to rely on the refusal of Salgado and the other gentleman to interact with him. One of his, and really his primary basis that he states is his reasonable articulable suspicion is, hey, I came up and these guys declined help. I've never had anyone do that. Well, that may be the case, but that in and of itself is not an appropriate basis to then escalate further, ask for driver's license and ask other law enforcement questions. It is, again- My question was more why is asking if he has a license a seizure, not whether he had reasonable suspicion to ask about the license. Why isn't that just part of his community caretaking function when he has people on the side of the road out in the middle of the night? It's seizure, Judge Collin, because I think an individual in that setting would not view themselves as able to decline the question. When the trooper initially comes up, they say we don't need anything, we're good. But he continues to ask that question and others related to law enforcement. At that point, it just is not a situation where someone on the side of the road would think they can decline further interaction with the trooper. And again, I- Suppose he did, suppose it was permissible to ask whether he had a driver's license. Do you think that he had reasonable suspicion at that point then if the man did not have a license because he had a traffic violation? I think once he's identified that Salgado doesn't have a driver's licensure, he's got probable cause to go ahead and cite, right. But- The key is whether he could ask about the license because if that was okay, then he's got probable cause for a traffic violation, he can take him back to the car. Correct. Okay, I understand. But then I think step two is once he takes him back to the car, he then extends that traffic stop to get the drug dog on scene. If you look then at the videotape at about 1.46 on the videotape, 1.46 AM, Mr. Salgado is by the officer's admission detained for the no driver's license. It's at that point that the district court concluded that it was a custodial setting and Miranda was necessary and suppressed all the statements after that. It's also at that point that the trooper makes the first inquiry about the availability of a police service dog and how far that is away. Again, at that point, the only grounds of reasonable or articulable suspicion to extend the detention that the trooper had was that these folks said, I don't need your help, that there was this sweatshirt with some electronics equipment in the back. And a marijuana leaf. Sure, but even the trooper had acknowledged that in and of itself, that's nothing other than a sweatshirt. But that doesn't necessarily provide an articulable suspicion. The only thing that's- It's one of several factors, and you were just omitting that the sweatshirt had the marijuana leaf on it. So I wanted to make sure that was part of the record. It's on it, but I didn't, from the record, have the perception that the trooper relied on that as a basis. And the district court certainly didn't exclude that out. The only thing that- In your view, is it permissible for this officer to ask questions of the driver, of these people, such as, where are you going, what's the problem here, where have you been, that kind of thing? I guess that gets back to the point of when, Judge Shepard. I think at the outset, the case that we rely on there is the USV Jefferson case. That at this initial point, when they just say, hey, we don't need any help, the trooper, I don't think, can ask further questions. But obviously, once Mr. Salgado has admitted he doesn't have a driver's license, he can ask some questions there, yes. Even if the driver says, the trooper pulls over, the driver says, that's okay, officer, we don't need any help. Isn't the officer permitted to ask some general questions about, well, you say you don't need any help, what's going on here, where are you headed, how long have you been here, those kinds of things? I would say no. And we would, looking back at Jefferson, is analogous in this sense. In Jefferson, there was a vehicle that was at a rest area in Iowa. The trooper came up, it was cold, bad weather, knocks on the window, says, how you doing, you okay? They say, yeah, we're fine. The trooper then goes on and says, can we have your driver's license? It was a rented vehicle, can I see the rental agreement? Takes him back to the car. The panel in that case didn't address whether those initial questions were in fact a seizure, because it concluded that, well, by the time he brings him back and asks for the rental agreement, that absolutely is a seizure. So they didn't have to go all the way back. I just think that it does go back to the earlier point. That's really all that case can stand for, isn't it? That asking for, taking a rental agreement and requiring the defendant to accompany the officer to the patrol car, that at that point, it became a non-consensual encounter. It doesn't really help us with what goes before. No, I mean, certainly the panel doesn't hold that what happens before is a seizure. I mean, it strongly suggests that. I think in this instance . . . It might not have constituted a seizure, but anyway, go ahead. I'm sorry, I didn't hear the first part of your comment. Go ahead, go ahead. I think here, again, two factors are so critical in assessing this. The first is that what the officer encounters is a welfare situation, not a law violation. And I think that changes the calculus of what inquiries are, in fact, reasonable at that point. And again, when these folks have said we don't need any help for him then to move forward to what is really a law enforcement purpose on the ID and the related questions, changes the nature of that to a seizure and to a custodial setting. I guess what troubles me is that it would seem that it is not customary or typical or normal for vehicles to be parked on the side of the highway. That's not the norm. Vehicles are traveling up and down the highway. If they're parked on the side of the highway, there's at least some reason for an officer to stop and inquire. And it's troublesome to think that the officer can't, as Judge Colleton has indicated, is part of just a community caretaker kind of function and duty and obligation to make sure that everything is as it appears, that the officer can't make some reasonable inquiries to include simply asking for the driver's license. I think that the critical component is you can ask some things, but it's do the questions you ask change the tenor of this so that the person believes or reasonably believes that they're seized. And I think the driver's license is such a critical for a law enforcement purpose. I think too, for us, it's critical. Remember, we see this as one checkpoint for the officer. It's also, if we assume that everything is fine up until the time that he asks for the driver's license and has probable cause to take Salgado back to the patrol vehicle. That thereafter, his questions related to drug interdiction, he asks a series of approximately 100 background questions. He asks for consent to search 17 times and extends out that search. He in fact doesn't ask for any ID information other than the driver's license for about 30 minutes. So as soon as the trooper took Mr. Salgado back to the vehicle, he immediately flips to a drug interdiction effort. And he extends out that stop beyond the purposes related to the traffic violation, the no driver's license, and turns it into a drug interdiction. Well, at that point, though, he has probable cause to arrest him, so- He does. Does he have an obligation to release him at the earliest possible time, or? He cannot unreasonably extend it, Your Honor, for purposes unrelated to the stop. I mean, that's long, that's the other case we've said in our brief. So at that point, he is extending this out simply for the purpose of drug interdiction as opposed to- I think long is a reasonable suspicion case, isn't it? I'm wondering if there's a difference between a reasonable suspicion case and a case where there's probable cause to arrest. But in all of those, Your Honor, most of those cases are ones where there's the probable cause for the traffic violation. But then there's also the question of, are you detaining or extending the duration of the detention to facilitate the drug dogging? That's what- Well, at what point did he find out that Salgado didn't know the name of the other passengers and that the name that Salgado gave, or at least that the officer understood him to give, didn't show up in the databases? It's early on in the conversation, Your Honor. It'd be between 146 and 145, excuse me, 154, so it's six to ten minutes in. Do you think those facts together with the refusal to help and the things seen in the car gave reasonable suspicion to bring in a drug dog? I don't, Your Honor, and also I don't think that it ultimately matters because he had made the decision at 146 to get the drug dog in. And is extending the search thereafter. But the one individual he had just met that day, there's not a dispute about that. The other, he said, I know him a little bit, I call him homie, he's my buddy. Okay, thank you very much. Ms. Rich, we'll hear from you. Thank you, Your Honor. May it please the court, counsel. My name is Catherine Rich, I'm from the District of South Dakota. I represent the United States on this case. I will start on the issue where Mr. Fulton led off, and that is the initial interaction with the officer and Mr. Salgado in this case. The district court held that it was initially a consensual interaction up until the point at which Mr. Salgado had said that he did not have a valid driver's license and he had been driving the vehicle. Mr. Fulton referenced Florida v. Bostic in which whether or not a reasonable person would feel free to disregard the questions and go on about their business. Now in this case, the court held that the defendant's, or excuse me, Mr. Salgado was not seized at that point and was free to continue on with outside the vehicle until the point at which he was asked back to address the driver's license issue. So, is it your position that the district court was correct that it became non-consensual when he failed to provide a driver's license, not at the step before? Yes, Your Honor. Yes, Your Honor, that is our position, and that by the time that he had, Mr. Salgado said that he did not have a license, that he had developed reasonable suspicion at that point for other reasons in addition to the fact that he didn't have a driver's license. When the trooper initially gets out of his vehicle and approaches Mr. Salgado's, it was not just that they refused consent, or excused assistance in this case, even given that it was 140 in the morning on a rural, two-lane highway in the middle of South Dakota, it was the way in which they refused assistance. The trooper testified that he got out of his vehicle and begins to approach them, and they hurried back from the front of their vehicle and met him near the back door of the driver's side of the vehicle. They hurried towards him to do that, which he found odd, and were repeating themselves that they didn't need the help and that they were fine. So it wasn't only the refusal, but the way in which they were refusing and the circumstances under which they were refusing. And the trooper testified that in over his four years of experience, this was odd to him, and that normally people wanted at least some level of assistance. Now in addition to that, when the trooper was standing next to the vehicle when they were speaking to him, is when he saw in the back seat of their vehicle, the electronic equipment partially covered, and the hoodie that had the marijuana leaf embroidered on it. And those were all factors that the district court did rely on. Including that there was reasonable suspicion to continue inquiries in this case. And the district court on page eight of its decision said that it was relying on all of those factors. And all of those things happened before the defendant is even in the trooper's vehicle. So the district court found that the trooper did provide a particularized and objective basis for continuing the detention, or excuse me, for beginning the detention. Did the trooper testify why the first question was, where's your driver's license? The trooper testified that they routinely, in these situations, or when they're encountering the public, will seek to know the identity of people for a couple different reasons. One, safety of themselves. Also, to know if this is a person who has been reported missing, or sometimes other cars will drive by and call in and say, hey, there's a car by the side of the road. And then that way, dispatch knows that a trooper already saw that person and has checked and verified that everything was okay. Did the trooper make any, I think Judge Shepard sort of referred to the concept that, look, the officer sees that the car on the side of the road needs to check up. It's sort of an unusual circumstance. What else, if anything, did the trooper intend to do to make sure everybody was okay? It seems like safety would be one of those factors. Is there anything in the record that shows that that was also something that he was looking into, other than just the identity of the driver? Yes, he testified that it was, that they do that as part of safety reasons. And that was one of the reasons for the flashlight in the backseat is what's going on with this situation. And kind of a general, to make sure that they understand what's going on on the side of the road and that, in fact, everyone is okay. So it was, it may be in more vague terms, but he did reference that this was a safety issue for them. Just the flashlight through the car is what he did? That's what I remember specifically. But he did reference that there was safety and policy reasons for making sure that they know who was there and that everything was okay. So those are the factors the district court relied on. And then those, as the situation progressed, continued to grow. In that once they, the trooper returns with Mr. Salgado to his vehicle to look into who is this person, trying to find out his identity. That's when Mr. Salgado starts providing evasive answers. He's saying he doesn't know his passengers' names, one that he knew a few months and one that he met earlier that day. The trooper is trying to identify him and talking to dispatch back and forth, providing them information that Mr. Salgado is giving them. And he continuously is coming back not on file. Not on file in South Dakota, not on file in Minnesota. They can't find any record of who this person is. And that inquiry as to identity is continuing on from the moment that Mr. Salgado is in his vehicle, which is about 1.43 AM. It's not until around 2.18 when the trooper speaks to the ICE agent that he's able to confirm that this is Alexis Salgado. And it's not even until after, until 1.58 when Mr. Salgado even provides his South Dakota identification card, which is expired. But from 1.43 until 1.58, he doesn't provide it despite repeating requests as to trooper trying to figure out who he is. And then it's even after that that he provides his immigration card, which allows the trooper to know to contact ICE to see if they have some sort of record of him. So even once Mr. Salgado is in the vehicle, he spends from 1.43 until 2.18 trying to figure out who this man is. And all of that is for purposes of who is he going to issue this citation to. So that's all going on. In the meantime, he is asking questions relating to consent to search or drug interdiction type of questions. But as this court has ruled it, that's permissible. And in this case, it didn't measurably extend the length of the traffic stop, which started at the point at which he said he didn't have a driver's license. And then the time from 2.18 on until the drug dog arrived, the troopers continuing to try to identify the other passengers in the vehicle. At this point, he doesn't know if he has a valid driver for this vehicle, which in the meantime is disabled. They're not able to go anywhere until the vehicle is recovered or has cooled down. So it was reasonable for the trooper to continue the detention in order to identify a driver and the district court found that the trooper was acting reasonably in seeking a drug detection dog and was diligent in his efforts to do so. And in fact, the initial call about the drug detection dog around 146 was not even a call out for a dog. It was the trooper trying to figure out where the closest dog was and how far away was someone going to be, at which point, and he continued to talk to Mr. Salgado, who did not give him consent to search the vehicle until after he had already called the second trooper to come with the drug dog. So for those reasons, the wait for the dog did not prolong the detention because nobody had been identified yet. And in addition, much of that delay can be attributable to Mr. Salgado's evasiveness in answering questions and in providing his identification. He wasn't giving answers and he had come to find out, the trooper realized that after talking to the ICE agent that Mr. Salgado had lied to him about previous arrests and charges. So based on all those factors, the reasonable suspicion of criminal activity was continuing to grow during the stop. Any efforts by the trooper to dispel any of his concerns were only heightened as his interaction with Mr. Salgado continued. So before you finish, could you address this matter of the magistrate taking these dog records ex parte? Mr. Fulton said he wanted to address that and he ran out of time, but as far as I could tell, the government wasn't really in favor of this either, but the magistrate seems to have a practice for some reason of keeping these ex parte. What's your understanding of that? Yes, your honor, the magistrate court taking those records ex parte to view in camera was over both the objection of the defense and the United States. The United States position was that these records are not relevant to the determination of whether or not the dog is reliable, and that there was other evidence going to be presented. And that was my first interaction with the magistrate court having done that. But I'm told from other attorneys that that's the regular practice and the court did say that. What's the reason the court thinks that these need to be held ex parte and not shown to the defense? It's my recollection that the magistrate indicated that it would view them and determine whether or not their records that should be provided to the defense. Didn't the magistrate consider them though? The magistrate court did calculate what it believed to be the percentage of accuracy of this dog. However, it was only one of the factors that the magistrate court relied on in finding this dog reliable. And the district court in its findings regarding the reliability of the dog and the accessibility of the records, the district court referenced the Florida v. Harris decision and indicated that it could assume, absent any conflicting information, that the dog was reliable and provided sufficient probable cause to search based only on her successful completion of training and certification prior to the stop, and that evidence was provided at the suppression hearing. So if there was any error in the magistrate court considering those records and citing to the percentage accuracy rate, the district court noted that it found a reliable, could find a reliable based solely on the certification. What if the percentages had not been so high? Where would we be then? And would they, do you think that we'd be in the same position in terms of, well, we can still affirm based on the certification process? I think so, your honor. And this court in previous cases has held dogs with accuracy ratings down near 54 or 57% to still be found reliable dogs based on all of these other factors. Training, their deployment in that specific case, and their certifications. Referencing all of those other factors that the dog still can be sufficiently reliable to provide probable cause to search. So in this case, the dog had a very high accuracy rate, but even if it had been, it would have to have been much lower than 54% to have had an impact on the records here. And I believe that's one of the things that maybe the magistrate court would have considered in turning over the records. Well, I'm still trying to understand why the magistrate thinks they should be held ex parte. Is there something confidential about these records? Does the government object to the defense seeing them? I know the government says they're not relevant, but is there something confidential about them that would interfere with law enforcement if defendants were able to see the reliability? That's not an argument that we presented below that there was any sort of identifying information or anything like that that would have, only that there's no relevance to them in reaching a reliability determination. And that to start providing them, then they would always be expected to be provided. And that hearings would turn into many trials of every deployment that this dog has had. Whether or not they were, that there's an explanation for one instance where they didn't find any drugs and the dog indicated. Did the defense seek these records to put them on, or did the court seek them sui sponte? The defense sought to have the government turn them over to- I see, I see, so it was in that context that the magistrate said, no, I'm not going to order you to turn them over to the defense, but you need to turn them over in camera? Yes, yes, that was the procedure leading up to it. I see, okay, so maybe the judge is thinking he'll look at them first, and only if there's something that he thinks is material, then he'll order them turned over. Do you think that's it? Yes, and in fact, the magistrate court noted when he issued his bench decision that he had reviewed them and was not going to turn them over. With that, the United States would request that this court affirm the district court in all respects. Thank you. All right, thank you very much. Thank you, Mr. Fulton. The case is submitted, and the court will file an opinion in due course.